IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 3:26-cv-0547 |
| ) | |
| v. ) | |
| ) | |
| **C-HEAR, INC.** and ) | JURY TRIAL DEMANDED |
| **ADENA HARMON,** ) | |
| ) | |
| Defendants, ) | |
| ) | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission"), for its Complaint against Defendants C-Hear, Inc. ("C-Hear") and Adena Harmon ("Harmon") alleges as follows:

## NATURE OF THE ACTION

1. Between January 2019 and October 2023, Adena Harmon, acting as the Chief Executive Officer and/or Chairman of software development company C-Hear, and other C-Hear representatives solicited multiple investors to invest in C-Hear. During these solicitations, Harmon and the other C-Hear representatives made a series of materially misleading statements and omissions, including omitting Harmon's criminal background and falsely claiming that C-Hear's primary software product was in trials with third parties and that the federal government had tried and was unable to hack into one of C-Hear's products.

2. When investors invested, Harmon directed certain investors to transfer funds to bank accounts that she represented were C-Hear bank accounts. In reality, Harmon opened these bank accounts for her own use without notifying the company. Harmon misappropriated

investor funds from the accounts, using the money to pay for personal expenses like luxury shopping trips and to pay off a criminal restitution order.

3. Separately, Harmon solicited at least one C-Hear investor to invest in another company that Harmon controlled, Elite Performance Data Labs, LLC ("Elite Performance"). Harmon made misrepresentations to investors about Elite Performance's business dealings, falsely claiming that an acquisition by the Dallas Cowboys was imminent and that the Cowboys had placed a multimillion-dollar order for Elite Performance's products. Harmon misappropriated almost all of the Elite Performance investor funds, using the money to pay her personal expenses, to pay for another business venture, and to pay C-Hear expenses.

4. Through their actions, Defendants violated, and unless enjoined will continue to violate, the antifraud provisions of the federal securities laws as specified below. The SEC brings this action against Defendants seeking: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains from Harmon, plus prejudgment interest; and (iii) civil penalties.

## DEFENDANTS

5. **C-Hear, Inc.** is a software development company that was headquartered in Dallas, Texas, from January 2019 to October 2023 (the "Relevant Period"). Its current principal place of business is Austin, Texas.

6. **Adena Harmon,** recently resided in Fort Worth and Roanoke, Texas. Harmon's current whereabouts are unknown, but upon information and belief she may be residing in Paducah, Texas. Harmon was a co-founder of C-Hear and served as its CEO from around February 2019 to July 2022. Harmon is also the founder, registered agent, and managing member of Elite Performance, a now-defunct Texas limited liability company whose principal place of business was at Harmon's former residence in Fort Worth, Texas.

**JURISDICTION AND VENUE**

7.     The Commission brings this action pursuant to authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

8.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78u(d), (e), and 78aa].

9.     Defendants offered and sold to investors C-Hear stock, which is a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].  Harmon offered and sold to a C-Hear investor a convertible loan agreement, which is a security because it is an investment contract and also a note under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Harmon offered and sold to an investor Elite Performance limited liability membership interests, which are securities because they are investment contracts.  The promissory note this same investor executed in connection with his Elite Performance investments is a security because it is an investment contract and also a note under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

10.     In connection with the conduct described in this Complaint, Defendants, directly or indirectly, made use of the mails or the means or instruments of transportation or communication in interstate commerce by, among other means, soliciting and accepting

investments via the Internet, transmitting investor contracts or notes via email, and accepting investor deposits via mail, wire, or other electronic-funds transfer.

11. Venue is proper in this District pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants transacted business in this District, and certain of the acts, practices, transactions, and courses of business constituting violations of the securities laws alleged in this Complaint occurred within this District. C-Hear was based in Dallas until 2024, and Defendants solicited investors within this district and executed investor agreements with investors within this district when they engaged in at least some of the conduct alleged herein.

## FACTUAL ALLEGATIONS

**A. Harmon and C-Hear made false and misleading statements and omissions to C-Hear Investors.**

12. Harmon and her co-founders formed C-Hear in September 2015 as a software development company. In 2019, C-Hear claimed that it had developed a small, software image file and data container that also incorporated audio. C-Hear called this technology "CHIF" (C-Hear Intelligent Format). C-Hear represented in its marketing materials to investors that its technology could make websites more accessible to individuals with visual disabilities by embedding images with audio describing the image. C-Hear also claimed its data file could replace video files in some social media marketing due to its much smaller file size.

13. After C-Hear got its first patent in early 2019, Harmon was appointed as CEO.

14. Over the next four years, Harmon and other C-Hear representatives solicited investors to purchase C-Hear stock. During some of these solicitations between approximately February 2019 and February 2022, Harmon and the C-Hear representatives used marketing materials, including a November 18, 2019 "C Hear, Inc. Business Plan" ("2019 Business Plan")

and/or a 2021 PowerPoint presentation titled "C-Hear Opportunity" ("2021 PowerPoint Presentation"). Harmon is listed as the author of the 2021 PowerPoint Presentation, and she was C-Hear's CEO and Chairman of the Board at the time of the creation and use of both the 2019 Business Plan and 2021 PowerPoint Presentation, both of which she approved and adopted by choosing to share them with prospective investors.

15. Both of these documents describe Harmon as having worked in the social media industry for more than 10 years, helping to promote non-profits and businesses. The description about Harmon also claims that the inspiration for C-Hear's technology came from Harmon's desire to save her clients money on ads.

16. Despite promoting Harmon's experience with non-profits, neither the 2019 Business Plan nor the 2021 PowerPoint Presentation revealed that Harmon had previously stolen from several non-profits or that she had been convicted of numerous financial crimes, including theft by check and uttering forged securities. The documents similarly did not disclose that Harmon had served prison time on multiple occasions for these crimes, or that she had an outstanding criminal restitution order against her for restitution she still owed to two churches for committing check fraud and stealing their money. The omissions relating to Harman's criminal background were important to investors, at least some of whom would not have invested had it been disclosed.

17. In 2022, C-Hear pivoted to marketing its CHIF data file container as more secure than other options—calling it the "armored car" of data containers. When soliciting new investments, C-Hear falsely claimed in its marketing materials, and Harmon and other C-Hear representatives claimed in oral communications without any basis, that potential customers were testing the CHIF. For instance, in July 2022, C-Hear distributed a document entitled "Investor

Package" to certain prospective investors describing the CHIF. This Package stated that the CHIF was "in trials with companies in cybersecurity, accessibility, intellectual property protection, oil and gas, and so much more." In truth, there were no trials and no company had tested the CHIF at that time.

18.     C-Hear hired a new marketing consultant in January 2022. Prior to joining C-Hear, this consultant invested $43,000 in C-Hear in May 2021, after Harmon, who was the current CEO, and others at C-Hear claimed that the CHIF was being tested by the federal government and the federal government was unable to hack into it.

19.     Upon joining C-Hear's marketing department, this consultant determined by May 2022 that C-Hear was making claims that were not true, which included claims that the CHIF was not hackable and that, in testing, the federal government had tried and failed to hack into the CHIF. This consultant advised the company to stop making these claims. Regardless, C-Hear's Chief Operating Officer, who was also a member of its Board, continued to falsely tell prospective investors as late as May 2023 that C-Hear was pitching the CHIF to the federal government and that the federal government was unable to hack the CHIF. Investors chose to invest in C-Hear based on these misrepresentations.

20.     Between January 2019 and October 2023, C-Hear raised more than $4.2 million from at least 48 investors who purchased C-Hear stock. C-Hear has never generated any revenue and all investor funds have been depleted without any distributions to investors.

21.     Harmon voluntarily stepped down as CEO in July 2022, though she stayed on as Chairman of C-Hear's Board and continued to be involved in investor communications until her resignation from the Board in January 2023.

**B.     Harmon misappropriated C-Hear investor funds.**

22.     C-Hear's bylaws required all funds of the corporation "to be deposited to the credit of the corporation in accounts that the Board may select." Despite this requirement, Harmon, without the knowledge of C-Hear's Board, opened two bank accounts in C-Hear's name in February 2022, listing only herself as the signatory.

23.     From February 2022 to October 2022, Harmon directed three C-Hear investors to deposit their investment funds totaling approximately $1,020,999 into the unauthorized bank accounts. All of these investors were led to believe that their funds would be used to support C-Hear's development of the CHIF and for the benefit of C-Hear. The stock purchase agreements purported to be between the individual investors and C-Hear, despite the fact that no other C-Hear representatives or Board members knew about these transactions.

24.     One investor ("Investor 1") paid nearly $700,000 into these unauthorized accounts. Harmon directed him to deposit the funds into the unauthorized accounts after she purported to sell him C-Hear stock in two transactions during 2022.

25.     Later, in August 2022, Harmon convinced Investor 1 to enter into a purported short-term $200,000 convertible loan agreement with C-Hear. In return for loaning C-Hear $200,000, the convertible loan agreement guaranteed Investor 1 16% interest over a three-month term. The convertible loan agreement also included terms for mandatory and optional conversions to C-Hear stock upon certain financing events. According to the agreement, the loan proceeds were to "only be used in connection with furthering the Company's development of the C-Hear Intelligent Format file [CHIF] and related technology … and [was] not to be used or otherwise allocated for any other venture, project or purpose." The note also included a provision providing that the loan was secured by C-Hear's interest in its products' patents.

26. Harmon was no longer the company's CEO at the time she entered into the convertible loan agreement on behalf of C-Hear, and C-Hear's Board did not authorize the loan agreement. She similarly did not have authority to offer C-Hear's interests in its patents as security for the loan. She never informed C-Hear's Board of the convertible loan agreement.

27. Investor 1 was not in the regular business of purchasing and selling securities when he entered into the convertible loan agreement and he had not invested in early-state software technology companies before.

28. When C-Hear did not repay the convertible loan on schedule, Harmon gave Investor 1 numerous excuses, including bank delays, for why C-Hear had not repaid the note. Neither Harmon nor C-Hear ever repaid Investor 1 his principal or interest due under the convertible loan agreement.

29. Of the total investor funds that Harmon directed to the unauthorized accounts (approximately $1,020,999), Harmon misappropriated approximately $641,000 (or 63%). Harmon used these funds to pay various personal expenses and to make payments unrelated to C-Hear's business, including satisfying her outstanding criminal restitution order, renting a large luxury home for a year, buying furniture and luxury retail items, and making cash withdrawals.

30. In January 2023, Investor 1's attorney contacted C-Hear's leadership when he did not receive the payment due pursuant to the convertible loan agreement. However, C-Hear's representatives could not identify or locate Investor 1's funds in C-Hear's corporate bank accounts. Around this same time, Harmon resigned as Chairman of C-Hear's Board.

**C.    Harmon made additional false misrepresentations and omissions regarding Elite Performance and further misappropriated investor funds.**

31. In 2020, while Harmon was CEO of C-Hear, she also claimed to run another technology start-up company, Elite Performance. Harmon approached at least two existing C-

8

Hear investors about also investing in Elite Performance. She told these two C-Hear investors that Elite Performance had developed technology that could be embedded in helmets and jerseys of professional athletes to collect data that would increase athletic performance. In reality, Harmon only had *the idea* for the technology—the product did not actually exist.

32. From July 2020 to September 2020, Harmon sold membership interests in Elite Performance to at least one investor ("Investor 2") in three separate transactions. Harmon told the investor that Elite Performance had developed certain technologies that it would attempt to sell to professional sports organizations and broadcasting networks.

33. Harmon sent Investor 2 a limited liability company agreement (the "EP LLC Agreement") that included a table that showed that a list of members, including Harmon, had each purportedly invested $275,000. After Investor 2 invested, Harmon sent him another version of the EP LLC Agreement that included an amended table reflecting Investor 2's investment and ownership interest in the company, but that also falsely represented that Harmon's contribution had increased to $625,000. In reality, Harmon and the other listed members had only invested $100 each. Harmon never told Investor 2 this or that any investment dollar amounts listed in the agreement included purported to just be "sweat equity" instead of actual dollars invested.

34. The EP LLC Agreement stated that its members would manage Elite Performance, but the agreement specifically designated Harmon and another individual as the managing members. As a managing member, the agreement gave Harmon the power to act on behalf of the company, to make all decisions with respect to the company's business, and to take all actions necessary to carry out such decisions. In reality, Harmon alone controlled Elite Performance. Investor 2 was a passive investor and did not participate in any management decisions regarding Elite Performance.

35. Harmon misled Investor 2 by telling him that Elite Performance was engaged in significant commercial discussions with the Dallas Cowboys. She told him that she had presented Elite Performance's technology to the Cowboys and was negotiating with the Cowboy's leadership regarding a potential purchase of Elite Performance. After hearing Harmon's misrepresentations, Investor 2 purchased membership interests in Elite Performance, investing a total of $240,000 in two transactions, one in July 2020 ($175,000) and the other in August 2020 ($65,000). Before Investor 2's second investment in August 2020, Harmon sent him a text message falsely claiming that the Cowboys had placed a multi-million-dollar equipment order with Elite Performance.

36. Harmon's representations to Investor 2 were all false. The Cowboys never represented that they would purchase Elite Performance or place an order for Elite Performance's undeveloped technology. Harmon only ever met once with a vice president of the Cowboys around August 2020. Harmon was aware after that meeting and by August 27, 2020, at the latest, that the Cowboys were not interested in acquiring Elite Performance and did not intend to place a large order for Elite Performance's product, which did not exist.

37. On September 15, 2020, Harmon emailed Investor 2 and the two other individuals that she falsely represented were Elite Performance members. Harmon referred to ongoing negotiations with the Cowboys and told Investor 2 that Elite Performance needed money to pay lawyer's fees and to create a demonstrative video highlighting Elite Performance's technology to give to sports broadcasting networks. She told Investor 2 that a deal with the Cowboys was imminent. She did not disclose that the referenced technology was just an idea and had not been developed, or that the Cowboys were not actually interested in purchasing Elite Performance or placing a large order for its purported product.

38. Based on Harmon's representations, Investor 2 invested an additional $85,000 in Elite Performance via a promissory note.  The note matured two weeks after its execution, had a 10% interest rate, and awarded Investor 2 with more stock in C-Hear as an incentive.  After Investor 2 sent his funds, Harmon emailed Investor 2, thanking him and lamenting the cost of the legal fees.  Harmon did not pay Investor 2 back after the two weeks passed. Instead, she told him that the bank delayed payment, but that she could not visit the bank to inquire because she was undergoing radiation treatments for cancer.

39. Of the total $405,000 investor funds in Elite Performance, Harmon misappropriated almost all of it (99%) for personal expenses, cash withdrawals, C-Hear's expenses, and to pay individuals who were C-Hear investors and not members or employees of Elite Performance.  Harmon also transferred at least $73,500 to a different tech startup company that she controlled.

40. Elite Performance has forfeited its corporate existence and, upon information and belief, is no longer operational.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

*Against Defendant Harmon*

41. Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

42. By engaging in the acts and conduct alleged herein, Defendant Harmon, directly or indirectly, in connection with the purchase or sale of securities, by the use of a means or instrumentality of interstate commerce, or of the mails, knowingly or with severe recklessness:

    a. employed a device, scheme, or artifice to defraud; and/or

    b. made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c. engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

43. By reason of the foregoing, Defendant Harmon has violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]**

*Against Defendant C-Hear*

44. Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

45. By engaging in the acts and conduct alleged herein, Defendant C-Hear, directly or indirectly, in connection with the purchase or sale of securities, by the use of a means or instrumentality of interstate commerce, or of the mails, knowingly or with severe recklessness made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46. By reason of the foregoing, Defendant C-Hear has violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## **THIRD CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

*Against Defendant Harmon*

47. Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

48. By engaging in the acts and conduct alleged herein, Defendant Harmon, directly or indirectly, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has:

   a. knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

   b. knowingly, with severe recklessness, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c. knowingly, with severe recklessness, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

49. By reason of the foregoing, Defendant Harmon has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)]

*Against Defendant C-Hear*

50. Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

51. By engaging in the acts and conduct alleged herein, Defendant C-Hear, directly or indirectly, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has knowingly, with severe recklessness, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52. By reason of the foregoing, Defendant C-Hear has violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

1. Permanently enjoining Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2. Permanently enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Harmon from purchasing or selling securities for her own personal account;

3. Ordering Harmon to disgorge all ill-gotten gains obtained as a result of the violations alleged herein, plus prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and

4. Ordering Harmon and C-Hear to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein.

5. Imposing such other and further relief as the Court may deem just and proper.

Dated:  February 19, 2026                              Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

*/s/ Tyson M. Lies*
Tyson Lies
Texas Bar No. 24087927
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1421
Facsimile:  (817) 978-4927
liest@sec.gov

*Attorneys for Plaintiff*